# SLAUGHTER *v.* HALLE.

PATENTS; PATENTABILITY; PRIORITY OF INVENTION; PRESUMPTIVE
EVIDENCE.

1. This court cannot entertain a contention by the unsuccessful party
to an interference that if the claims in controversy are to re-
ceive a broad construction such as the Commissioner gave them,
affirming the primary examiner in that regard, and reversing the
examiners-in-chief, who gave them a narrow construction (inti-
mating that otherwise they would not be patentable) — then they
are unpatentable.

2. In an interference case involving a card-writing attachment in
type-writing machines, the circumstance that the junior applicant
failed to disclose his invention to his employer, a type-writer
company, which was in pursuit of some such device, although
it would have been to his interest so to do, and did nothing to
give effect to what was in his mind until he went into the
employ of another company and was then stimulated into ac-
tivity by what he had seen done by the senior party, who was the
president of the former company,— is strong evidence that he
did not have the invention during his first employment.

No. 203. Patent Appeals. Submitted November 12, 1902. Decided December 3, 1902.

HEARING on an appeal from a decision of the Commis-
sioner of Patents in an interference case.          *Affirmed.*

The COURT in the opinion stated the case as follows:

This is an appeal from a decision of the Commissioner of
Patents in an interference case wherein the subject-matter
of controversy is an improvement in type-writing machines
in the shape of a card-writing attachment, the several features
of which are stated in the issue of interference in sixteen
several counts, as follows:

" 1. In a type-writing machine, the combination with the
flat platen and the printing mechanism arranged thereover,
of a holder interposed in a plane between the printing

mechanism and the writing-surface of the platen, said holder having guiding and holding means for the edges of a card or sheet.

" 2. In a type-writing machine, the combination with the flat platen, the printing mechanism arranged thereover, and the main tracks or guides for said printing mechanism, of a card or sheet holder interposed in a plane between said main tracks or guides and also in a plane between the printing mechanism and the writing-surface of the platen, said holder having means for engaging opposite edges of a card or sheet.

" 3. In a type-writing machine, the combination with the flat platen, and the printing mechanism arranged thereover, of work-holding members interposed in a plane between the printing mechanism and the writing-surface of the platen, and disposed in opposite relation, said work-holding members having guiding and holding means for the edges of a card or sheet.

" 4. In a type-writing machine, the combination with the flat platen and the main tracks or guides for the type-carriage, of work-holding members arranged in a plane between said tracks or guides for the carriage and disposed in opposite relation, said work-holding members having guiding and holding means for the edges of a card or sheet.

" 5. In a type-writing machine, the combination with the flat platen and the type-carriage supported thereon, of a card or sheet holder comprising guideways for the edges of the card or sheet, the said guideways being disposed at opposite sides of the printing area of the platen and interposed in a plane between the carriage and the writing-surface of the platen.

" 6. In a type-writing machine, the combination with the flat platen and the traveling type-carriage supported thereon, of card-holding guideways arranged to have the carriage travel thereover and located at opposite sides of the printing area of the platen.

" 7. In a type-writing machine, the combination with the flat platen and the traveling type-carriage supported thereon, of card-holding guideways located at opposite sides of the

printing area of the platen below the plane of the type-carriage, and entrance-guides in communication with the front ends of said guideways.

" 8. In a type-writing machine, the combination with the flat platen and the traveling type-carriage supported thereon, of adjustable card-holding guideways supported upon the writing-surface of the platen, below the plane of the type-carriage and arranged to have the type-carriage travel thereover.

" 9. In a type-writing machine, the combination with the flat platen and the traveling type-carriage working thereover, of card-holding guideways arranged below the plane of the type-carriage and transversely adjustable with relation to the platen.

" 10. In a type-writing machine, the combination with the flat platen and the type-carriage supported thereon, of card-holding guides arranged in a plane between the carriage and the platen, and having an individual lateral adjustment.

" 11. In a type-writing machine, the combination with the flat platen and the traveling type-carriage supported thereon, of separate spaced card-holding guides held upon the writing-surface of the platen, below the plane of the carriage and confining there between the printing space or area for the card or sheet.

" 12. In a type-writing machine, the combination with the flat platen and the type-carriage supported thereon, of spaced card or sheet holding guides applied to the upper side of the platen below the plane of the type-carriage and each provided with a longitudinal guideway, and an entrance-guide in communication with the front end of the guideway.

" 13. In a type-writing machine, the combination with the flat platen and the type-carriage supported thereon, of spaced card or sheet holding guides applied to the upper side of the platen below the plane of the type-carriage and each provided with a longitudinal guideway, an entrance-guide in communication with the guideway, and a frictional retaining device engaging with the edge of the card or sheet.

" 14. In a type-writing machine, the combination with the

flat platen and the type-carriage supported thereon, of spaced card or sheet holding guides applied to the upper side of the platen below the plane of the type-carriage and each provided at one edge with a longitudinal guideway, and an elevated entrance-guide arranged at the front end of said guideway, and having a deflector formed with a face leading directly into the guideway.

" 15. In a type-writing machine, the combination with the flat platen and the type-carriage supported thereon, of card or sheet holding guideways arranged in a plane between the type-carriage and the platen, and a card or sheet magazine having guideways arranged in a plane between the type-carriage and the platen, and a card or sheet magazine having guideways for the individual cards or sheets directly adjoining and aligning with those for holding the card or sheet upon the platen.

" 16. The combination of a flat platen for type-writing machines, card or sheet holding guides associated with the platen and the type-carriage, and means for causing the printed card or sheet to turn over, face downward, after leaving the holding guides."

Most of these counts are mere reiterations of each other in different phraseology: in some, however, there are different elements. All are taken from the application of the appellee, Hiram J. Halle, who was the first to file his application in the Patent Office, which he did on October 7, 1899. They were copied into the application filed by the appellant, Robert Kent Slaughter, upwards of four months afterward, on February 26, 1900, for the purpose of the interference. Both parties filed preliminary statements, and afterward amended them. Only the amended statements need here to be considered.

Halle, the senior applicant, stated that he conceived the invention mentioned in counts from 1 to 14, both inclusive, and disclosed it in the spring of 1897; that he conceived and disclosed the invention mentioned in counts numbered 15 and 16 in January of 1899; that the invention of the first thirteen counts was reduced to practice by being embodied in a

full-sized machine in January, 1899; and that the invention of the other three counts was similarly reduced to practice in May, 1899.

Slaughter, the junior applicant, in his amended preliminary statement, alleged that he first conceived the invention or inventions of the sixteen counts in December of 1897, disclosed it between December 1 of 1897 and January 15 of 1898, and reduced it to practice by the construction of a full-sized operative machine in May of 1899.

The parties were not unacquainted with each other, and there is some suggestion that the question for decision is not so much one of priority of invention as of originality. But this is unnecessary to be considered.

The acting examiner of interferences awarded judgment of priority of invention on all the counts of the issue, except the sixteenth, to Halle. On the sixteenth, he awarded priority to Slaughter. Both parties appealed; and the board of examiners-in-chief on the appeal reversed the decision of the examiner as to the first thirteen counts, and affirmed it as to the other three. This left Halle with a judgment of priority as to the counts numbered 14 and 15, and Slaughter with a judgment of priority as to all the other counts. Halle appealed from the decision of the board of examiners-in-chief to the Commissioner of Patents. Slaughter does not appear to have appealed. The Commissioner reversed the decision of the board and awarded judgment of priority of invention to Halle upon all the counts involved in the appeal to him, which included all except those numbered 14 and 15. From the decision of the Commissioner appeal has been taken by Slaughter to this court.

*Mr. Perry B. Turpin* (*Mr. Robert B. Killgore* being with him on the brief) for the appellant.

*Mr. E. G. Siggers* for the appellee.

Mr. Justice Morris delivered the opinion of the Court:

We are confronted here by a situation somewhat analogous to that in the case of *Oliver* v. *Felbel,* 20 D. C. App. 255, re-

cently before us, wherein there was a suggestion by the Commissioner implying doubt of the patentability of the invention there in controversy and apparently reserving that question for future consideration.    We there intimated that, until the question of patentability was settled in the Patent Office, there would be no propriety in our adjudication of the question of priority of invention, for the plain reason that, until there was actual patentable invention, there could in law be no question of priority of invention.    Here there is difference of opinion between the Commissioner of Patents and the board of examiners in regard to the scope of the issue. The Commissioner in his opinion says in this connection:

" The examiner of interferences awarded priority to Halle upon the first thirteen counts of the issue, and the reversal of that decision by the examiners-in-chief was due principally to a difference of opinion as to the meaning of the claims in issue.    The examiners-in-chief gave these claims a very limited construction, whereas the examiner of interferences considered them broader in scope.    It is believed that there is nothing in the terms of the claims or of the state of the art to render necessary the limited construction given by the examiners-in-chief."

The examiners-in-chief had intimated that, if a broad construction were given to the claims, they would not be patentable in view of the condition of the art at the time.    But as they themselves took the narrower view of the scope of the claims, they had no occasion to direct attention to the question of patentability: and the Commissioner only refers to it to dismiss it from further consideration.    The appellant, however, seeks to raise it again in the statement of his grounds for appeal to this court, and insists upon it in his brief.    He contends for it, however, conditionally, as did the board of examiners-in-chief: that is, that the claims in controversy must receive a narrow construction, as otherwise they would be unpatentable.    The argument, however, is that, if the claims are to receive a broad construction such as the Commissioner of Patents, affirming the examiner of interferences in that regard, gave to them, then they are un-

patentable. This contention, in accordance with our repeated decisions, we cannot entertain.

Regarding the question of priority of invention as properly before us, we find that the several tribunals of the Patent Office have analyzed and discussed the testimony in the case very carefully; and we do not see that any good purpose would be subserved by any further or other analysis of it. We are disposed to concur in the conclusion reached by the Commissioner, and for the reasons stated by him. We would refer, however, specifically to one item of testimony in the cause, the conduct of the parties on a certain occasion, which speaks louder to us than the words of fallible witnesses.

Slaughter, the junior applicant, had been in the employment of a firm or company in New York, known as the Elliott and Hatch Book Typewriter Company, and he was in their employment in December of 1897, when he claims to have made his invention and disclosed it to some members and employees of that company. He was in this employment from November 15 of 1897 to March 10 of 1898. On April 9, 1898, he entered into the employment of a rival company, the Fisher Typewriter Company, and remained therein until April 8, 1899; after which he returned to the employment of the Elliott and Hatch Company. In May of 1898, while he was in the employment of the Fisher Company and soon after he had entered it, he had a conversation, according to his own testimony, with Halle, who was at the time the president of the Fisher Company, in which he suggested some improvements in the Fisher machine for card-printing. But he swears very positively that neither then nor at any other time did he disclose to Halle the invention which he now claims to have had at the time; and the reason he gives for his silence is that he thought of something better, as he supposed, at the time. It is very clear from the circumstances of this interview, according to Slaughter's own statement, that it would have been most natural for him to make the disclosure at that time, if he actually had the invention; and that he did not make the disclosure for the reason that he did not have the invention.

It is very remarkable that, during this whole year 1898, for the greater part of which he was in the service of the Fisher Company, which to his knowledge was in pursuit of some such device, Slaughter never disclosed anything of his invention, notwithstanding that apparently it would have been to his interest so to do. He did nothing whatever to give effect to anything which he had in his mind, if anything he did have in mind; until he went back to the Elliott and Hatch Company and was stimulated to activity by what he had seen done by Halle in the Fisher Company.

We think that the Commissioner of Patents was right in his decision in this case, and that his award of priority to Halle should be *affirmed.*

*The clerk of the court will .certify this opinion and the proceedings in this court to the Commissioner, according to law.*